PROPHYLACTIC BRUSH COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FLORENCE MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 15383, 26079, 32996, 47845, 47846.   Promulgated February 29, 1932.

*Ferdinand Tannenbaum, Esq.,* and *George E. Cleary, Esq.,* for the petitioners.

*Elden McFarland, Esq.,* for the respondent.

## OPINION.

ARUNDELL: Petitioners claim that the patent issued in 1909 and the patent applications pending on March 1, 1913, had a value on that date of $1,750,000, and that deductions for exhaustion should be allowed on that value. The value claimed is the amount fixed by petitioners' witness, Boyle, who was the only witness called upon to testify as to value. Boyle had been connected with petitioners in various capacities since 1897. In 1913 he was sales manager, later treasurer, and for several years prior to 1930 he was president. He reached his valuation on the basis of estimates that in five years after 1913 sales would be doubled and that savings effected through the use of machines would increase to 50 cents per dozen of tooth brushes.

Sales for 1913 amounted to approximately 221,000 dozens. Doubling this figure and applying the 50 cent estimated saving gives $221,000, which the witness capitalized at 10 per cent thus, reaching a figure of $2,210,000. This he reduced by 20 per cent to take care of contingencies, and gave the resulting figure of $1,750,000 as his opinion of the value of the patent and pending applications.

Petitioners cite *Boggs & Buhl* v. *Commissioner*, 34 Fed. (2d) 859, and *Bonwit Teller & Co.* v. *Commissioner*, 53 Fed. (2d) 381, as requiring our acceptance of the opinion of value expressed by witness Boyle, " unless there are facts in the record clearly to show that the valuation was in error." The *Boggs & Buhl* decision is based upon the supposition that the Board " disregarded the only positive and direct evidence as to the value " of good will, but it recognizes the rule that the Board may " reject expert testimony and reach a conclusion in accordance with its own knowledge, experience and judgment." We do not understand this decision to mean that where we are unable to accept the conclusion of a witness we must have knowledge of the subject matter acquired outside the record. Obviously it would be error for us to base a conclusion on facts outside the record, save perhaps such as come within the rule of judicial notice. As we read the decision, it means to state the same rule as in the *Bonwit Teller* case, namely, that we may adopt a value other than that fixed by a witness " provided that there were sufficient basis in the record for the value adopted." In *Pfleghar Hardware Specialty Co.* v. *Blair*, 30 Fed. (2d) 614, which involved the valuation of good will, the court said:

It is urged that no witness testified as to the value of good will in 1913. In the absence of an actual sale, such testimony of value can be but an opinion, and can only be formed by taking into account the same financial history as the Board had before it, and applying some such formula as that approved by the Tax Bureau. The absence of opinion testimony, is not, therefore, important.

See also *Am-plus Storage Battery Co.* v. *Commissioner*, 35 Fed. (2d) 167; *Anchor Co.* v. *Commissioner*, 42 Fed. (2d) 99; *Tracy* v. *Commissioner*, 53 Fed. (2d) 575.

In our opinion the valuation claimed can not be justified on the facts existing and known at March 1, 1913. While it is true that petitioners have been tremendously successful, it does not appear that the full measure of their success was visible on March 1, 1913. Moreover, it appears that a substantial part of petitioners' income is properly attributable to intangibles other than patents. There are in evidence briefs and memoranda filed with the respondent in support of petitioners' claims for special assessment in which petitioners represented that they had extremely valuable good will and trade names, trade-marks, and secret processes. The present record does not contradict those assertions.

The conclusion expressed by the witness is based in part on his estimate that production would be doubled in five years after 1913. At the same time he had planned and had in mind an extensive advertising campaign, which was put into effect and was successful. Between 1909 and 1916 the sum of $471,088.10 was spent in advertising petitioners' products. It thus appears that the estimate of production on which the valuation was based was to depend on the success of advertising rather than on the capacity of the patented machines. From 1909, when the first patented machine was put into operation, to 1912 the production had increased from 170,498 dozens to 207,374 dozens, an increase of 21 per cent, or at an average rate of a little over 5 per cent a year. Contrasted with this past history, petitioners' witness testified that he expected production to increase 100 per cent in the next five years, or at an average rate of 20 per cent a year. While there is evidence that improvements in the machines were expected to result in increased speed of operation, the facts known at March 1, 1913, do not warrant any such step-up in production as estimated by the witness.

Likewise, it appears that the estimated saving of 50 cents per dozen was an overoptimistic estimate and not warranted by the known facts. Prior to 1913 the saving effected had averaged only about 23 cents per dozen, and in 1913 it was 22 cents, including the estimated 4 cents saved in the cost of bristles. According to one computation of petitioners, savings in 1917 and 1918 amounted to only 16 cents per dozen, and on the calculation prepared in connection with the present proceedings the total savings were 22.9 cents for 1917 and 26.7 cents for 1918. We think it not unreasonable to assume that an increase in savings would follow from improving the brush-making machines and increasing production, but the evidence does not establish any reasonable ground for believing that the saving would be more than doubled at the end of five years.

We are also unable to agree with the witness' method of capitalizing earnings to reach a value. In the few cases in which earnings in excess of a reasonable return on tangibles have been capitalized for the purpose of valuing intangibles, it has been customary to use a rate of not less than 15 per cent.

The evidence does, however, satisfy us that at March 1, 1913, the patents and pending applications had a substantial value. The machine patented in 1909 was the only automatic brush-making machine in this country. The monopoly obtained by the possession of that patent gave petitioners a distinct advantage over manufacturers using the hand method of making brushes. At March 1, 1913, it had been demonstrated that the use of the machine would materially lower costs and enable petitioners to meet the competition of foreign-made

brushes. It had also been demonstrated at that date that machine production could be increased. It was reasonably evident that, with the improvements being made, some of which had been completed in 1912, the hand method would in time be entirely displaced by the machines. At March 1, 1913, the machines patented first had been in use about four years and the improved machine for about a year. The average annual production of those machines was something over 10,000 dozens of brushes per machine. According to the testimony of the former president, petitioner was able to build and put into operation an average of about two additional machines per year. As petitioners' product was a staple commodity for which there was an established market, and it was a fair assumption that its field would expand as costs were lowered, it was justified in anticipating that it would have need for the installation of additional machines. On the basis of the performance of the machines in operation at March 1, 1913, and allowing for increased production as the result of further improvements, and taking into consideration the rate at which additional machines could be built, it was possible to predict with reasonable certainty the production that could be expected in the future. It was also known at March 1, 1913, that savings in the cost of manufacture amounting to about 22 cents per dozen had been effected through the use of machines, and, assuming a reasonable increase through the lowering of overhead as a consequence of improving the machines, it was not unreasonable to expect that there would be some increase in the amount of the savings to be effected. While anticipated savings and increased production are proper elements to be taken into consideration, a prospective purchaser of patents would not look at them alone in fixing his price. The value of a patent lies in the amount of profits it will bring to its owner. In determining in the present case what a willing buyer might be expected to offer for the patents, the anticipated savings must be translated into terms of profits, which requires that they be reduced by such factors as the cost of manufacturing the patented machines, and the costs of their operation and maintenance. A prospective purchaser would also take into consideration the period over which profits might be expected to be realized and discount those of future years to their present worth. The profits realized prior to March 1, 1913, were susceptible of calculation, and on the basis of past performance it was possible to forecast what production and profits might be expected in the future.

But even if it be conceded that savings alone are a proper measure of value, as contended by petitioner, the facts known at March 1, 1913, would not support the value claimed. On the basis of established production and savings, with a reasonable allowance for in-

creased production through improvements, the total savings to be expected, discounted to present worth, would be between $500,000 and $600,000. On the same basis, but allowing for an increase in savings to the amount upon which the valuation witness based his calculations, gives a figure slightly in excess of $1,000,000.

Considering all the evidence in the light of known facts at March 1, 1913, and giving effect to the profits and the increases in production and savings that the evidence indicates might reasonably be expected over the life of the patents, it is our opinion that $865,000 represents the fair market value at March 1, 1913, of the 1909 patent and patent applications pending on that date.

Petitioners contend that the period over which exhaustion deductions are allowable is seventeen years from January 19, 1915, when patents were granted on improvements to the brush-making machine and for which applications were pending at March 1, 1913. In view of the fact that the claim is for exhaustion deductions on the value of the original patent, granted June 6, 1909, as well as the applications pending on March 1, 1913, and that the evidence was directed to both and not limited to the patents issued in 1915, we are of opinion that the deductions should be spread over the average life of the patents, which will be seventeen years from March 23, 1912. See *Syracuse Food Products Corporation*, 21 B. T. A. 865, 890, and cases there cited.

*Decision will be entered under Rule 50 in each of the proceedings except Docket No. 15383, which will be restored to the general calendar for further hearing under Rule 62.*